Good morning. John Jackson, your honor, for the appellants. This is an unprecedented case, your honor. Never in the history of the judiciary have the courts upheld seizures for these type of offenses. And that is cases where there's regulated recreational hunting, non-commercial trade, and it's for loss of paperwork or government errors and clerical errors. And that's what the nature of the law. In 2000, Congress passed Civil Asset Reform Act, CAFRA, and it provided that no innocent owner under any federal statute should be deprived of his property through forfeiture. Unless it's contraband or you can't own it. Unless it's contraband. So these cases say this is you can't own this stuff because it wasn't imported properly. Well, they do own it. They can't. It's illegal to possess. It's illegal to possess, right. So if you can't possess it, the innocent owner defense doesn't apply. The problem is that it's only in this region, not the rest of the United States. It's only one solicitor. Well, this is where we are, you know. It's one solicitor, and it's contrary to long-term practice in the services manual on inspection and law enforcement inspections. And it's curable. More important, the point I want to make today is it's curable. It's curable. The site resolution provided is curable, and in each of these instances, the government has either issued replacement permits or retrospective permits to correct the clerical errors or said they were willing to do so. In one case, the government wrote three times, which means that what's happened here is you went to the court. Excuse me. They wrote three times after the retrospective documents were prepared. Exactly. The problem is they have to do it before the documents are prepared. Well, not under CITES. If it's a retrospective permit, it is apt to do it. The reality is these were permits, but there was a clerical error in them. A retrospective permit was issued or a replacement permit was issued, depending on the circumstances, which are too detailed to get into in this short period of time. But they did exactly what they're supposed to. They might not have conformed in every detail, but they wrote over and over again saying, we'll do whatever you want. Don't punish this innocent sportsman. And they were not responded to. No reply. The Director of Wildlife is examining government. He doesn't get a response. These were induced violations, Your Honor. They could be cured today. It could have been cured yesterday. It can be cured tomorrow. The solicitor is forcing these people into this position. Now, that gets us to a secondary part of the argument, Your Honor. The CAFR not only provided that you're an innocent owner and shall not be deprived of your property under any Federal law, the solicitor thinks differently, but also provided what the definition was, twofold. Either you didn't know of a mistake, the owner didn't know of a mistake when it occurred, and that was true in all these cases, or, second, you took steps to correct it, not necessarily perfect, successful steps, but you took steps to correct it. That's true in all of these cases. The solicitor just won't accept the corrections and won't make another attempt and won't respond to the foreign governments that are under the Act of State or some doctrine or assigned to some respect under the convention that's involved or entitled to some respect. But CAFR also had another clause. CAFR provided that, what the Constitution provides, that a person that's deprived of their property or entitled to a hearing determine the excessiveness of the proportionality of the forfeiture. We're talking about $500 offenses, maximum fines. If they were fined, they're losing $70,000 trophies. How do you get that? I had the impression they declared them to be a couple hundred bucks on their customs declaration. On the import declaration form, the values change when we went from $250 to $10,000. They varied. But the customs regulations, the services regulations themselves say that it's not a reliable indicator because nobody really knows what the commercial value is when that entry is made by some agent. They just take a figure. So that is that we never got that far in this case. $70,000. How did they come up with $70,000? Is that how much the trip was? The total cost of the trip, Your Honor. And there's court cases saying that. Under violation, you could treat a criminal under the Lacey Act for a $70,000 offense. And there are more recent cases saying that. I mean, the $70,000, that's their airfare, their hotel, their car. No, not in that case. It wasn't. I don't think so. But it could be. The cost of acquisition. There are a number of cases saying the cost of acquisition is adequate in his admissions. But he also acquired a lot of other trophies, too. I didn't quite follow you, Your Honor. Well, didn't he have other trophies other than the lion? There was more than one trophy. He took 13 animals. It wasn't just one. Yeah, well, we've probated it, Your Honor. $70,000 was a lion on Appendix 2, and that was the cost of a lion hunt loan. Okay? But as some of the evidence, the court never got there because the court said it was not penal, it was remedial. The problem with that, and that's a point I must make, Your Honor, is that CITES says, the CITES Convention says, says it's to penalize and deter unlawful traffic. Well, the fact that it's meant to deter something doesn't mean that the taking is a penalty in that sense. I mean, presumably, all statutes are enacted to conform behavior to the desired end, but that doesn't make them all penalties. Except this is a CITES seizure, under CITES. And the CITES Convention specifically says that the purpose of seizures is to penalize people for the trade. The resolutions of CITES that implement it, the 175 parties of CITES, have passed a resolution saying the purpose of it is to penalize those that use invalid permits. The Fish and Wildlife Service says, and I quote from 72 Federal Register 48402, page 48416, the treaty requires parties to penalize trading and possession of specimens traded contrary to the Convention. That comes under valid CITES documents, section 23.2650CFR. So there's no question that as a component here is to punish the person. We're punishing people that are innocent, that when governments make clerical errors, which are inevitable, we're taking valuable trophies. I don't care if it's $250 or $70,000. I've got one right now, $105,000. And this all riding on these cases here, Your Honor, today. Thank you. Thank you, Mr. Jackson. Morning. Morning. May it please the Court, Kirk Kastorf for the United States. After the drug trade, the international trade in threatened and endangered species is the world's second largest black market. The CITES treaty is the primary means of combating this trade, and it relies on the strict documentary regime for its effectiveness. It also imposes a range of sanctions, from small fines up to including $100,000 fines and a year of imprisonment. The common thread connecting the three hunters involved in this consulted appeal is that all of them violated CITES by importing protected wildlife into the United States without valid documentation. And what appellants are seeking is, in face of an admitted violation, to have some sort of exception made to the CITES regime that is not applicable or existent under the CITES regime or U.S. regulations. Mr. Johnson, please. That is a retrospective correction or cure, right? That's what they're saying. And you're – I'm just trying to make sure I understand your argument. You said they're looking for an exception that isn't in the law, and as I understand it what they're asking for is an opportunity to come back and fix the paperwork after the fact, after they've already been denied permission to bring these in. That's correct, Your Honor. It's slightly complicated because the three different seizures are at issue here with the consolidated cases. Two of the seizures were of leopard trophies, which are an Appendix 1 species, and retrospective permits are available for leopard – for Appendix 1 species only if they fall into a very limited exception for personal effects, for example, a piece of jewelry that you bought at a market. And so for two of the appellants, a retrospective permit simply isn't applicable. In the third case, Mr. Ward's case, the lion trophy, that's an Appendix 2 species, and a retrospective permit could be available if certain procedures had been followed, the most important of which is that at the time that the species enters the United States, the importer is supposed to notify Fish and Wildlife, request an inspection, and then request consultation with the exporting country. That gives both Fish and – both the United States and the country of export an opportunity to investigate what was wrong with the paperwork, make findings contemporaneous with the invalid paperwork, and then correct the error. In fact, what happened here – What bothers me is the fact that this seems like excessive bureaucracy on the part of the – here there was an acknowledged error by Zambia, and that they would be the principal ones that are concerned about conserving the lions. They tried in every way four different times to consult with the FWS and no response. And so what more could they have done? Well, Judge Hugg, the question is what the importers in this case could have done. Under CITES, it's the importer who bears responsibility for complying with the law. And what the importer did is bring the item into the United States on an invalid permit. If they didn't know at that – if the hunter didn't know at that time the permit was invalid, they surely knew when instead of notifying Fish and Wildlife, they first wrote to the country of export, still did not inform Fish and Wildlife at that time, and then mailed the invalid permits without comment to Fish and Wildlife. At the time of the import, they filled out a computerized application stating that they had – they were in compliance, and then they needed to mail the paper compliance. At the time they mailed that, it's apparent they already knew about the problem. Yeah, I understand that technically what you're arguing. But it just seems to me that from a practical standpoint, there was an acknowledged error, just a typographical error of putting another trophy in place of the lion. They tried to correct it. They notified the Fish and Wildlife Service four different times as to the ability of consulting and so forth. Fish and Wildlife Service never responded to them at all. It seems to me very strange indeed that this isn't enough to take care of it. Your Honor, the United States' concern is that the CITES Treaty poses an obligation explicitly both on the importing country and the exporting country to satisfy themselves of compliance. And in this case, by not notifying the Fish and Wildlife Service contemporaneous with the import and engaging in a back-channel effort with the country of export, the U.S. never had an opportunity contemporaneous with the issuing of those documents to investigate the lack of compliance. Well, Zambia contacted them four times, and the Fish and Wildlife Service never did anything. Well, those contacts, Your Honor, took place more than a month after the import, and after the importers, even though they were aware of the problem with their paperwork, hadn't notified the service. And CITES works primarily on a strict documentation regime, and when you don't give an opportunity for both countries to investigate contemporaneously, there's no way to be sure that there's no type of fraud or that there are no other concerns with the paperwork. Well, but any kind of fraud would be revealed even afterward by Zambia contacting them If the Fish and Wildlife Service had a problem, they could tell them, but they just didn't respond. Well, Your Honor, respectfully, I'm not sure that would resolve all examples of fraud. If I can give you one example of fraud, a hunter had a permit to bag a leopard, shot a leopard on the safari, and the leopard that the hunter apparently shot, this isn't an unrelated case, the hide was in extremely poor condition. It showed up in the U.S. on an expired permit. All of a sudden, a much larger leopard skin with a hide in better shape, and then by the time that the U.S. went back to the other country, the country seemed to think that there was an error with the permit. The problem is That's all interesting, but, I mean, in our case, it's undisputed, isn't it, that the mistake was that British Airways lost it? Well, Your Honor, I don't think that. I don't agree that that's undisputed. What is in the record is a letter from British Airways. This is for Mr. Madero's trophy that says, you've told us that you gave us permits and that they didn't show up in the U.S. We don't know where those permits are. We apologize for the inconvenience. Frankly, that's the type of letter that anyone could get by complaining to the airline that an airline had lost their luggage. So I'll ask you again. Did you dispute it? We don't know the answer. The answer is no, you didn't dispute it, I think is right. You didn't say that's not what happened to the papers or we don't think that's what happened to the papers? No. We took the position that because the U.S. didn't have an opportunity to investigate the matter fully and that CITES hadn't been complied with. In the other case, you don't dispute that it was, was it Zambia that made a typographical error? The government of Zambia says they made a typographical mistake. So there's two different errors. In Mr. Crook's case, it was Namibia, it was imported on an expired permit, and their explanation is that the exporting country meant to give them, I think, three months and mistakenly wrote in 60 days. And then in Mr. Ward's case, it showed up with no permit whatsoever. They had an extraneous permit for a different species, and they said what Namibia meant to do is they meant instead of writing to write that other species, they had meant to write a lie in. They had 13 or so listed on a manifest of some sort? Well, yes. So there's also, there's a manifest which listed the lie in, and then there was simply no export permit at all for that species. But I believe there was an export permit for a different species. And they say the reason that happened is when they transferred the 13 from one document to the other, one got out of order or something of that sort? That's correct. Do you have any dispute about that? We don't have any evidence that directly contradicts their account. But we believe that the CITES sets out specific mechanisms to deal with those circumstances. One is when a retrospective permit could potentially be issued, it's the obligation of the importer to notify Fish and Wildlife to present the specimen and then to request consultation, which is not what occurred in this case. A second option is to request a process called remission, which is an opportunity for the secretary, in the secretary's discretion, to say this species was imported unlawfully under the CITES, but we're going to waive illegality for purposes of possession. And those are the two processes that. I wonder, this is not something that you may be in a position to answer or not, but I'd like to address this to both counsel. In view of the particular facts of these cases, would these be appropriate cases for mediation since there is this discretionary opportunity on the part of the secretary? Your Honor, respectfully, I don't believe so for two reasons. The first is we've been talking primarily about the fact of Mr. Ward's case. Mr. Ward is the only one who actually demanded that Fish and Wildlife initiate a judicial proceeding against him. The other two claimants proceeded solely administratively, and their judicial remedy is barred under CAFRA. So even if there were a concern about the propriety of those permits, it would apply only to Mr. Ward because the other two appellants are procedurally barred for pursuing their claim. What about Ward? I think, as to Mr. Ward, I think the Fish and Wildlife Service would be extremely reluctant to attempt consultation at this point. They believe their regulations don't permit it because now it's been more than two years since whatever theoretical paperwork error has occurred, Fish and Wildlife has never had an opportunity to conduct an independent investigation and verify that they believe the documentation is correct. And I think that's the city's duty. Wait a minute. Why haven't they had an opportunity to investigate it after Zambia, on four different occasions, tried to get them to consult and they didn't? Well, Mr. Ward has never requested of the Fish and Wildlife Service they investigate. Mr. Ward took the position that Zambia has written to the U.S. and that the U.S. is obligated to accept the opinion of an exporting nation on treaty compliance, and that's flatly contradicted by two portions of the CITES treaty. One is the portion which states that both the exporting and importing countries But they're supposed to consult, and the consulting which seemed to me could have taken place when it's obvious that Zambia feels there was just a typographical error and now the Fish and Wildlife Service just doesn't respond and says, well, no, it wasn't done in time. And it seems like Zambia was trying to correct this as best it could. And it seems to me I'm surprised that you're unwilling to have a follow Judge Shulman's suggestion when just from a practical standpoint it just seems so unfair. Well, Your Honor, respectfully, I don't believe that it's unfair for a couple of reasons. First is that even if the United States had initiated consultation once Namibia contacted them, that was more than a month after the illegal import and after the importer had provided invalid documents. So there would already be concern about whether a time-lapse investigation had occurred. The second point, which I think is extremely important, is that the U.S.'s only ability to guarantee compliance with treaties is to demand compliance from the importers and from the hunters. In a lot of these instances, hunters and importers are hiring brokers in a foreign country to plan their safari and the brokers don't do any sort of sufficient compliance. And to me that's very clear in this case because the brokers apparently lost one set of documents on an airline, one they sent out even though there was no permit for the species at all, and one they sent out on an expired permit. And Fish and Wildlife doesn't have the ability to directly prosecute those international brokers. All right. Well, let's talk about the Ward case. I'd like to confine this to the Ward case. Why doesn't it make sense to confer about that now? Your Honor, in Mr. Ward's case, the species left the country without any export permit whatsoever, and Fish and Wildlife believes that to effectively enforce CITES we need to demand that hunters Well, it had a permit, but it had a typographical error on it. No, Your Honor, that didn't have a typographical error. Excuse me. You're talking over Judge Hogg and it's hard to hear. I apologize. Judge Hogg. Well, it did have a permit. It just had a typographical error in that permit where it had a wasabi instead of a lime, and they tried their best to correct it. And it just seems to me kind of a bureaucratic nightmare that they aren't allowed to correct it. Respectfully, Your Honor, these trophy hunters are paying in some cases $70,000 or more to go on these safaris, and we think it's reasonable as a means of enforcing the CITES treaty to expect that they either individually inspect their permits for compliance or hire people who are qualified to do that effectively. In this instance, the apparent mistake is either that there was no permit at all or that the permit listed an entirely incorrect species. And it seems entirely Well, there was a permit. There was a permit, was there not? Your Honor, that's not clear. There was one It didn't have a lime in there. It had a wasabi instead. Well, Your Honor, we don't know whether that permit was intended for the lime. There was an extra permit for a species that didn't come in, and there was no lime permit. Well, certainly Zambia said it was intended. That's correct, Your Honor. So why don't you know? Because, again, Your Honor, we didn't have an opportunity to investigate contemporaneously with the import. And we believe that it's reasonable to expect that in an instance of a plainly invalid permit, that hunters who explicitly bear the responsibility for ensuring compliance hire qualified people to make sure that their documents are in compliance with an international treaty that demands, that depends on strict documentation. Any other questions, Judge Graber? No. Judge Hugg, anything else? No. Thank you. Thank you very much, Mr. Kessler. Mr. Jackson, back to you. Let me ask you this before we get going. The Ward case is in a separate category. The other two cases, counsel says you're procedurally barred because you chose the administrative rather than the judicial forfeiture route. What's your answer to that one? Yeah. It's the Edwards case, Your Honor. The case is in a separate category.    Well, the case is in a separate category. They did not have the hearing. They were promised. The assistant solicitor in this region has a firm view that she cannot return if there's any So the whole process is a sham. People think they're going to get a petition for remission and a remission process and they're not getting that. They're denied that because she's of the firm opinion that she cannot return them to them no matter what their arguments are or how innocent they are. The innocent owner defense does not apply.  The law does not apply. So the whole process is a sham. The prosecution has a firm opinion that the law does not apply. Even the ---- she said that the Constitution doesn't apply to her, that excessive penalties are not something for her to consider. That's beyond her regime. So that's the problem. Also, I should say here that those two in the San Francisco court were lepers. They aren't on Appendix I. But one of them was a lost paperwork. And that's a different provision under CITES. That's a replacement permit, and it doesn't ---- it doesn't ---- it's not limited to any particular category, Appendix I, II, or III. And a replacement permit was gathered. And there's no question about the truth of these things. The government that issues a permit has a copy of it. All right? The people that export it have a copy of it. All that's in the record. So the dispute, if any, is a false dispute. In fact, it's a more questionable conduct upon U.S. enforcement agents and solicitor and assistant solicitor in this case. They do not ---- they contend everything. And when it's not contendable, going back to the Lyon, the ward case, the Lyon, all the documents that are related are in the record. The country's own export permit says ---- has the same list of species. And you can see when it transferred something, the Tessabee instead of the Lyon. It's all there. The veterinary certificate says the Lyon. The country's own export permit has the Lyon. There were some other certificates that had the Lyon. There's no dispute. And the government says this is our mistake. You know, it's an innocent mistake. What more would you like us to do? We'll do anything. This is the whole conservation basis. The duck hunters pay for the waterfowl in the United States, and the safari hunters pay for the conservation paradigm in Africa. We train them. We educate them. It's the license fees. You know, $5,000 for a leopard, $10,000 for a lion, just the license fee alone. It depends on the country. But sometimes it's $20,000, just the license fee alone. So these things are clear and obvious in the record. What we're talking about is just being difficult. Let me ask you, this happened in 2007, didn't it? Where is the Lyon trophy now? The Fish and Wildlife Service custody, Your Honor. They could sell it to the public. They still have it? So it's not really contraband, is it? As far as you know, they still have it? They keep it in safe custody, Your Honor. After a fall for a job, normally they dispose of it at will, and they're free to sell it. So it's not true contraband. What I'm getting at is can we give you a remedy if we were to agree with you? Could you get the trophy back at this point, or is it gone, or do you? Every reason to believe that the trophies are still available, and every reason to believe that these governments would do whatever is necessary because it was their mistakes to correct it. And it's curable. It's induced. There was no violation in place in the first place because the U.S. Government induced the violations. They wouldn't cooperate. It's a cooperative arrangement. They won't accept the word of the government and the documents of the government that issued the permits. They know what they issued. They have copies of it. In the Madero case, the first one, the leopard, they were given a notarized copy of it, and they wouldn't accept that. Before the delay that occurred searching for it, there was actually a provision in the service manual that people would be given 30 days in such cases to search for it, and they complained that it was 30 days before anybody responded to them. Well, they had a notarized affidavit. They had a copy of the original from the government that issued it. There's no dispute about it. And they had a make-up, a replacement permit, and they argue, want to argue about it, but the reality was they didn't argue that until after the fact. At the time, it was just contraband per se. Roberts. Thank you. Mr. Kessler, if I just wanted to ask you, do you know is the lion trophy still in the possession of the service? Your Honor, I need to double-check on my understanding of the case. It is, you think? Okay. Thank you, gentlemen. Interesting case. The cases just argued are submitted at this time. Thank you. Thank you.
judges: Hug, Silverman, Graber, Cjj